**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ X

SHARON LEE,                                          :
                                                     :
                        Plaintiff,                   :
                                                     :          Civil Action No.
            v.                                       :
                                                     :
TRUIST BANK, SUNTRUST BANK, INC.,                    :          **COMPLAINT**
GENSPRING FAMILY OFFICES, LLC,                       :
ROBERT WEISS, in his individual and                  :
professional capacities, and THOMAS                  :          **Jury Trial Demanded**
CARROLL, in his individual and professional          :
capacities,                                          :
                                                     :
                        Defendants.                  :
------------------------------------------------------------ X

       Plaintiff Sharon Lee hereby alleges, by and through her undersigned counsel, Wigdor

LLP, as and for her Complaint against Defendants Truist Bank ("Truist"), SunTrust Bank, Inc.

("SunTrust" or the "Bank"), GenSpring Family Offices ("GFO" or "GenSpring"), Robert Weiss

and Thomas Carroll (collectively "Defendants") as follows:

## PRELIMINARY STATEMENT

       1.     In February 2019, SunTrust Bank, Inc. announced its pending purchase by

BB&T for $28 billion in an all-stock deal, creating the sixth largest U.S. lender, being the

biggest bank deal since the 2007-2008 financial crisis.  On December 6, 2019, the merger

between BB&T and SunTrust closed, forming Truist Bank.  The two banks continue to operate

separately, while merging their operating systems.

       2.     However, two months prior to the announcement of this significant merger,

SunTrust had just completed a year-long campaign of heinous retaliation against Plaintiff

Sharon Lee, a Senior Family Investment Officer in Defendants SunTrust Bank, Inc.'s and

GenSpring Family Offices' Private Wealth Management group.  Indeed, in December 2018, Ms.

Lee's employment was unceremoniously terminated because she was an Asian female who had the audacity to stand up to the White male dominated "boys' club" that ran and dominated SunTrust.

3.      As detailed herein, Ms. Lee, throughout her employment, was subjected to discrimination and harassment based on her gender, national origin and age, as well as unlawful retaliation because she engaged in protected complaints about the discrimination,

4.      Shockingly, as detailed herein, SunTrust knew about Ms. Lee's numerous protected complaints, but allowed individuals responsible for the wrongdoing to embark on a sloppy, haphazard attempt to cover up the misconduct.

5.      Furthermore, as alleged herein, the subsequent paper trail purporting to "document" Ms. Lee's alleged misconduct resulted in a smear of her professional and personal reputation, and eventual termination, leaving Ms. Lee with no choice but to seek redress against SunTrust and GenSpring for the egregious wrongs and other unlawful conduct committed against her.

6.      As such, Ms. Lee brings this action seeking injunctive, declaratory and monetary relief against Defendants for violations of 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* ("Title VII"), the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA") the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* ("NYCHRL").

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights

under Section 1981 and Title VII.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under State and City law pursuant to 28 U.S.C. § 1367(a).

8.      Pursuant to 28 U.S.C. § 1391(b), venue is proper in this Court because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## PARTIES

9.      Plaintiff Sharon Lee is a former employee of SunTrust and GFO, and at all relevant times, worked at SunTrust's New York City office.  Ms. Lee is a resident of the State of New York, and, at all relevant times herein, met the definition of an "employee" under all relevant statutes.

10.      Defendant Truist Bank is a North Carolina business corporation with a principal place of business located at 200 West Second Street, Winston-Salem, North Carolina. At all relevant times, Truist was an "employer" within the meaning of all applicable statutes.

11.      Defendant SunTrust Bank, Inc. is a Georgia business corporation with a principal place of business located at 303 Peachtree Street NE, 9th Floor, Atlanta, GA 30308. At all relevant times, SunTrust was an "employer" within the meaning of all applicable statutes.

12.      Defendant GenSpring Family Offices is a Florida business corporation with a principal place of business located at 303 Peachtree Street NE, 9th Floor, Atlanta, GA 30308. At all relevant times, GenSpring was an "employer" within the meaning of all applicable statutes.

13.      Defendant Robert Weiss is a resident of the State of New Jersey, and, at all relevant times, was the Executive Director of SunTrust's NorthEast regional offices, including

New York, supervised Plaintiff's employment, and met the definition of Plaintiff's "employer" under all relevant statutes.

14.     Defendants Thomas Carroll is a resident of the State of Georgia, and, at all relevant times, was the Head of Division Wealth Management of SunTrust, supervised Plaintiff's employment, and met the definition of Plaintiff's "employer" under all relevant statutes.

## ADMINISTRATIVE PREREQUISITES

15.     On September 5, 2019, Ms. Lee filed a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII.

16.     On December 9, 2019, the EEOC issued Plaintiff a Notice of Right to Sue. This action is being filed within 90 days of the issuance of Plaintiff's Notice of Right to Sue.

17.     After commencement of this action, a copy of this Complaint will be served on the New York City Commission on Human Rights and the Office of Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

18.     Any and all other prerequisites to the filing of this suit have been met.

## FACTUAL ALLEGATIONS

### I.     Ms. Lee Joins GenSpring Family Offices

15.     In August 2015, Ms. Lee, a 56-year-old-woman of Chinese descent, started work at GenSpring Family Offices, an affiliate of SunTrust, with the title "Family Investment Officer." She reported to GFO's Chief Executive Officer Willem Hattink ("Hattink").

16.     Ms. Lee was recruited to work at GFO because of her extensive experience in the investment management and hedge fund industries that began in 1987. Ms. Lee worked for some of the top companies in the industry, including JP Morgan, Deutsche Bank, Donaldson

Lufkin & Jenrette and Steven Cohen's firm, SAC Capital Advisors.  At the time, GenSpring served clients with $25 million or more in managed investments.

17.     Ms. Lee was assigned to work on some of GenSpring's most prestigious and valued family client accounts, including Ralph Wyman's ("Wyman") family account.  Wyman and his nephew-in-law, Juan Meyer ("Meyer"), were both "clients" and "employees" at GFO.

18.     When she was hired and during her employment under Hattink, Ms. Lee worked in a dual role that consisted of hedge fund sourcing/researching, as well as portfolio management, *i.e.*, an investment strategist function.  Before she was hired, Hattink addressed her concerns about the job being primarily a business development and sales position, and made clear that hedge fund analysis was an equal function expected of Ms. Lee.  Because of her focus on hedge fund sourcing, Hattink explained that he was not giving Ms. Lee a sales target in her contract.

19.     GFO clients, including Wyman and Meyer, knew that Ms. Lee had dual functions within the group.  In fact, clients knew that because of her work analyzing hedge funds, Ms. Lee had a lighter client load than other advisors.  At all times, her responsibilities involved sourcing, researching and meeting with hedge funds.

II.     **Due Diligence Concerns and the "Boys' Club" Atmosphere**

20.     Shortly after starting at GFO, Ms. Lee vocalized her concerns about due diligence deficiencies she saw in connection with the researching of hedge funds.

21.     Specifically, in late November or early December 2015, she told Hattink that she was worried about flaws in the sourcing and researching of a hedge fund named "Mission."

22.     Hattink marginalized Ms. Lee's opinions and told her that even if Mission was not a fit for her clients, it may be a fit for clients of other advisors.

23.     Despite Ms. Lee's reservations (and at the same time, excluding her from the decision-making process), GFO's investment committee approved Mission in January or February of 2016.

24.     Six months later, Mission was removed from the platform because of due diligence concerns.

25.     After the removal, Ms. Lee again expressed her opinion that GFO needed to place experienced hedge fund investors on the investment committee rather than people with only mutual fund experience.

26.     Ms. Lee suggested specific employees that could provide valuable insight into the process, including herself, Jen Cobleigh and Erik Popham.

27.     She verbalized her view that the procedures in place to approve hedge funds on the platform were unacceptable because people with no hedge fund experience or who were otherwise inexperienced with alternative investments were making decisions.

28.     Hattink and Ernie Dawal ("Dawal"), the Chief Investment Officer, ignored Ms. Lee's complaints. By ignoring and dismissing Ms. Lee's complaints, GFO's risk management was impeded by Dawal's lack of remediation to address her concerns.  Hattink and Dawal thereby breached their fiduciary duties and responsibilities (both SEC and Bank regulations) to GFO's clients, and furthermore, exposed GFO to compliance risks, and hampered GFO and all of GFO advisors' abilities to adhere and abide by their fiduciary duties and responsibilities, under SEC and Bank regulations.

29.     In early 2016, Ms. Lee also complained about a lack of basic guidance from Dawal.

30.     On a call with Hattink and Dawal, Ms. Lee said that, since she started in August 2015, Dawal had failed to give advisors proper direction and guidance about such issues as the investment credit cycle and emerging markets.

31.     In Ms. Lee's experience at prior companies, such guidance was standard from the Chief Investment Officer.

Rather than answering her questions, and without explanation, Hattink told Ms. Lee after the call to "never" raise those issues again.

32.     Regardless of the incident, Ms. Lee's superiors, the majority of whom were white men, consistently and regularly minimized her opinions and discounted her almost 30 years of experience in the hedge fund and investment management industries.

33.     At the same time her concerns were discounted, her male supervisors began to label Ms. Lee as someone that was not capable of being a "team player."

34.     Not surprisingly, Ms. Lee was accused of being an antagonist while her male coworkers, as well as superiors, were free to engage in impetuous and aggressive behavior without repercussion.

35.     Ms. Lee witnessed her male peers and male superiors yell, engage in temper tantrums and earn reputations as "hotheads" without suffering discipline.

36.     By way of example only, in late June or early July 2016, Charles Holmes ("Holmes"), a former business development marketer in the New York office, ended a meeting with Ms. Lee by storming out of the room after shouting that she should not be at an upcoming prospect sales meeting despite the fact the she was preparing a presentation for the prospect.

37.     Understandably upset, Ms. Lee complained to David Herritt ("Herritt"), who was Holmes' supervisor.

38.     Again marginalizing the behavior of a male employee, Herritt told Ms. Lee to "overlook" the words, attitude and treatment by Holmes directed at her because Holmes was "under pressure" to close a deal.

39.     On another occasion, Hattink labeled Ms. Lee as "combative," a textbook gender biased description for women, in connection with her complaint about aggressive behavior towards her by Holmes.

40.     Hattink went on to use the word to describe Ms. Lee several times after this incident.

41.     As discussed below, Robert Weiss ("Weiss"), a white male to whom Ms. Lee eventually had to report, was known by employees as a hothead with a severe temper.

42.     It was common employee chatter that no one disagreed with Weiss in order to avoid being on the wrong end of his rage.

43.     Other employees described Thomas Carroll ("Carroll"), the head of Division Wealth Management who worked out of Atlanta, to Ms. Lee as being a "ball-buster."

### III.     SunTrust Absorbs GenSpring

44.     In January 2017, SunTrust hired Weiss and Charles Swarns ("Swarns") to head the Manhattan office.

45.     Although SunTrust and GFO continued to operate as separate entities, the employees worked in the same office located at 610 Fifth Avenue.

46.     In July 2017, SunTrust announced that GenSpring would no longer exist as a separate registered investment advisor.

47.     All GFO advisors, including Ms. Lee, became SunTrust employees in the Private Wealth Management group.

48.     Also in 2017, Swarns told Ms. Lee that he wanted her involved in a client prospect meeting involving the Gupta Family.

49.     Swarns, Ms. Lee and other Bank employees including Niles Greene ("Greene"), Rick Vazza, Dan O'Brien ("O'Brien") and Andrew Lavaia, worked on their anticipated presentation to the Gupta Family.

50.     In a Sunday night email sent before a scheduled Monday morning call about the presentation, Swarns wrote to tell Ms. Lee and her peers that for purposes of the meeting, he wanted all of them to send him their bios to include in the presentation book.

51.     Specifically, Swarns said he needed to know their ages and marital statuses, *i.e.*, "single, engaged, married," for the presentation book.

52.     The next morning on the call, Ms. Lee was upset that Swarns asked for this information and told him and the others on the call that the Gupta Family did not need to know her age or marital status in order to evaluate her as a portfolio manager.

53.     Ms. Lee said that she was happy to describe her background and career experiences, but she was not going to include the personal information about her Swarns requested in the presentation book.

54.     Angry at Ms. Lee, Swarns yelled on the call, "**I disagree. You can drop off! Just drop off!**"

55.     On June 28, 2017, the group met in New York to discuss the presentation to the Gupta Family.

56.     Ms. Lee took the opportunity to ask Greene about his views on the age and marital status request by Swarns.  Greene told Ms. Lee that it was odd and that Swarns "should know better," especially coming from JP Morgan.

57.     Ms. Lee also asked O'Brien about the request.  O'Brien told her that because he was married and had experience, he did not mind.

58.     However, he noted that for Ms. Lee, because she was single and female, it may "work against" her.

59.     Ms. Lee told her colleagues in both the Manhattan and Greenwich offices what information Swarns had asked her to provide.  Importantly, she also told Hattink.

60.     Rather than do anything to correct the harm, Hattink opted to disagree with Ms. Lee and told her that it depended on the "context" as to whether such information was relevant.  Such a response further marginalized and discredited Ms. Lee's concerns.

**IV.     Weiss Becomes Ms. Lee's Supervisor**

61.     In August 2017, Ms. Lee was told that Weiss was her new supervisor.

62.     During the next several months, Ms. Lee and Weiss had weekly one-on-one meetings to discuss her work.

63.     Ms. Lee used the opportunity to tell Weiss about her complaints involving due diligence when she started, specifically discussing Mission, and explained how her role at GFO was not the same as the other advisors because she was responsible for sourcing and researching hedge funds, as well as working as a portfolio manager.  Ms. Lee also relayed her concerns regarding ongoing due diligence of hedge funds, which she had discussed with Hattink in April 2017, and Director of Alternative Investments Spencer Boggess' ("Boggess") lack of supervisory oversight of hedge fund due diligence.

64.     Also during the meetings with Weiss, Ms. Lee told him that Hattink labeled her as someone that was not a "team player" and combative.

65.     She further told Weiss that Swarns wanted her age and marital status information to be included in the presentation book to the Gupta Family.

66.     Ms. Lee specifically told Weiss that she believed the request was unlawful. Weiss said he was "surprised" and would look into it.  However, Weiss never spoke with Ms. Lee about the incident again.

67.     During one of these meetings, Weiss told Ms. Lee that Boggess felt that Ms. Lee was "ignoring him."  Ms. Lee thought Weiss must be joking.  She later learned that Boggess told other employees that when Ms. Lee walked by his office and his door was open, she did not say hello.

68.     In November 2017, during one of their meetings, Ms. Lee followed up about whether her Fiduciary license Series 65 would be registered under SunTrust.

69.     Weiss, quick to temper, quipped that he already got back to her.

70.     When Ms. Lee dared to tell the truth (which meant she disagreed with him and that Weiss had not clarified the question), Weiss lost his temper, wrote something down in his notebook and ended the meeting.

**V.     Weiss Gives Ms. Lee a Performance Write Up**

71.     On December 2, 2017, Ms. Lee was asked to meet Weiss and Boggess.  In the meeting, the two men berated Ms. Lee for various alleged performance problems.

72.     Notably, the two men chastised her for, *inter alia*, meeting with a hedge fund manager.  However, Ms. Lee's function and responsibilities included sourcing and analyzing hedge funds.  As a fiduciary advisor (SEC and Bank regulated) to her clients, Ms. Lee was also responsible for the ongoing monitoring of funds in which her clients were invested.  Due to Boggess' lack of supervisory oversight of his group, however, Ms. Lee was concerned about the platform's investment process, risk management, and compliance standards, and

accordingly, all Family Investment Officers' abilities to fulfill their legal fiduciary obligations in the best interest of clients.  Ms. Lee merely sought to obtain the information she needed in her role as a fiduciary.

73.     In essence, Ms. Lee was penalized for engaging in work necessary to perform her job and nothing more.  Ms. Lee disputed the write-up with Human Resources ("HR").

## VI.   **Blatant Retaliation Against Ms. Lee**

74.     On January 25, 2018, Ms. Lee was asked to meet with HR employee Michael Eads ("Eads") and Carroll.  What started off as a discussion about her protected discrimination complaints unraveled into Carroll's inability to control his temper and him threatening Ms. Lee with termination.

75.     During this meeting, the unlawful and inappropriate behavior by Carroll included the following:

- Carroll using an aggressive and threatening tone of voice when speaking to Ms. Lee;
- Carroll intimidatingly pointing his finger at Ms. Lee while saying that he "believes in the SunTrust flag";
- Carroll asking Ms. Lee *why she filed a complaint with HR;*
- Carroll smirking and saying to Ms. Lee, "*are you going to sue 'us'?*"; and
- Carroll suddenly raising the issue of her termination and saying, "let's speak transition."

76.     Extremely upset by the unexpected threat of firing, Ms. Lee told Carroll and Eads that she did not want to resign or transition.

77.     In response, Carroll escalated the threat and told her the offer "was a onetime thing," and that he did not want to be "spinning [his] wheels for nothing."

78.     Distraught, Ms. Lee left the meeting visibly shaken and unsure what had happened.

79.     Leaving no time for her to figure it out, SunTrust retaliated against Ms. Lee by taking her off the Gupta Family account.

80.     The vindictiveness of the decision hit Ms. Lee hard because the day before, Swarns had thanked Ms. Lee for all the hard work she had done to land the Gupta Family account.

81.     The following week, Ms. Lee again complained to HR that she was being unlawfully harassed and said that senior management was operating with a "boys' club" mentality, and that she feared further retaliation.

82.     Ms. Lee asked if an HR employee could be present during her future one-on-one meetings with Weiss.

83.     Horrifically, SunTrust engaged in more retaliation.  Within days, Carroll called Ms. Lee and told her the following:

- Eads is "off the case";
- They "had talked with their lawyers";
- Ms. Lee was not going to be offered a transition package; and
- She no longer was allowed to meet with hedge fund managers.

84.     It was clear that SunTrust intended to remove responsibilities from Ms. Lee, and ensure that she be unable to perform her role satisfactorily.  The goal to force her to quit was obvious.  Additional retaliatory conduct included:

- In late February 2018, Weiss gave Ms. Lee a negative performance evaluation;
- Weiss gave Ms. Lee a lower bonus for the year because of her alleged poor performance;
- An HR consultant met with Ms. Lee to tell her that after a purported "investigation," SunTrust concluded that her discrimination complaints were "unsubstantiated";
- In April 2018, Weiss gave Ms. Lee another performance write-up for allegedly failing to understand Bank policy, and for sending the wrong message to Wyman and Meyer (who were both longtime clients of GFO as well as "employees" of GFO);

- In April 2018, Weiss placed Ms. Lee on a two-month probation;
- Ms. Lee tried to have a meeting with Joe Thompson ("Thompson"), head of Private Wealth Management, about her probation, but her request was ignored;
- Weiss told Ms. Lee that she needed to meet with Boggess because she needed to "make amends" with him and try to rebuild a relationship with Boggess;[1]
- Weiss told Ms. Lee that she needed to meet weekly with him, HR and Felicia Speetjens to describe her work in detail;
- A male employee from the Charlotte, North Carolina office, Nathan Willis ("Willis"), was assigned to humiliatingly chaperone Ms. Lee during all meetings with the Wyman Family account, and to send a written report of Ms. Lee's conduct back to Weiss after each meeting;[2]
- During a mid-summer monthly call for the Wealth Management team, including Ms. Lee, Thompson said that diversity and inclusion were important issues and mentioned that Carroll has more female managers than many other divisional managers at SunTrust;
- In August 2018, Ms. Lee received a poor midyear performance review and was accused of not being a team player;
- Ms. Lee was excluded from a Bank event at the U.S. Open which members of four generations of the Wyman Family attended; and
- No new prospects were passed along to Ms. Lee for the remainder of the year, ensuring that she and Keith Cho had the lowest revenue of all the advisors.

85.   Unquestionably, SunTrust repeatedly treated Ms. Lee "less well" as compared to male employees.

86.   During this period, among other conduct suggestive of bias, Ms. Lee was told she has a "vibe" that she gives off and she needed to do something about it.

---

[1]   Weiss ordered this despite the fact that Ms. Lee had complained about Boggess, and SunTrust was aware that the idea of having one-on-one meetings with him caused Ms. Lee extreme anxiety.  Ms. Lee spoke to HR about the issue.

[2]   Willis, a white male, is more than 10 years younger than Ms. Lee and has less experience in hedge funds.  Despite this fact, Willis repeatedly cut-off Ms. Lee while she was talking.  Other employees at GFO and the Bank described Willis as abrasive and not well-liked by peers or clients.  Upon belief, Willis was not labeled a poor "team player" or combative.

87.     Although Ms. Lee had no idea what the "vibe" referred to and asked for clarification; nothing was said.

88.     Even though countless male employees worked from home, remotely and while travelling, Ms. Lee was told she needed to be physically present in meetings and spend more time taking other employees out for coffee to make them "comfortable" with her.

89.     Oscarlyn Elder ("Elder"), a supervisor located in Richmond, Virginia, told Ms. Lee that it would be helpful if she used FaceTime rather than the phone during their calls so that Elder could read and assess Ms. Lee's body language.

90.     Ms. Lee knew that Elder told the only other Asian advisor, Keith Cho, that he was not acting like a senior professional because he was "too nice."  This a classic stereotype associated with Asian character traits in the workplace.

## VII.    Unlawful Termination

91.     In December 2018, SunTrust unlawfully fired Ms. Lee.

92.     Based on emails, SunTrust knew that Ms. Lee was out of the office on Thursday and Friday, December 13 and 14.  On Monday, December 17, Ms. Lee arrived at work to find that her files had been removed from the top of her desk and all her desk drawers were locked.

93.     Quickly she realized that everything on and in her desk had been removed, sifted through and haphazardly thrown back in.  Ms. Lee was unable to find her priority to-do list and other important items.  Getting anxious, she asked the office manager what happened, and was told, "ask Charles [Swarns]."

94.     Ms. Lee set out to Swarns' office only to realize that she left her ID back in her office.  She returned again to her desk, upset and in disbelief that someone had rummaged through everything in her desk.

95.     Swarns arrived in Ms. Lee's office and said there had been an internal audit.[3]

96.     Seeing her in distress, Swarns told Ms. Lee that everything in the office is company property, belongs to the company and nothing belongs to her, even items in her desk.

97.     Distressed, Ms. Lee said to Swarns, "You may leave now!"  He left.[4]

98.     Ms. Lee continued to frantically look for her priority lists and other information she needed for work that day but could not find what she needed because of the disorganization. Later that day, she was told that there is a "policy" she violated because client information was in some of the files left on her desk.  She was also told that she was the **only employee that failed the audit.**

99.      At 2:00 p.m. that day, Ms. Lee had a scheduled call with Elder who was in Richmond, Virginia.  The call lasted about thirty minutes and included discussions about trades in several client accounts and setting up client meetings for January and February of 2019.  Ms. Lee believed the drama of the purported "audit" was behind her.

100.    Ms. Lee arrived the next day and completed her usual tasks, such as inputting trades.  That evening, Elder called her and said that Ms. Lee had been fired for "unprofessional conduct."

101.    Evidently, when you are the only Asian female employee in the New York office of Private Wealth Management, you are expected to politely take time out to say "hello" to male superiors while walking in the hallway on your way to the restroom, take extra steps in

---

[3]     At no time has SunTrust suggested that the "audit" was a regulatory audit initiated by the SEC, FINRA or by the Bank's Office of the Comptroller of the Currency ("OCC") compliance.

[4]     Contrary to claims by SunTrust, Ms. Lee did not curse, use foul language or throw anything.  She also has sliding doors to her office and therefore could not have "slammed" doors, as accused.  SunTrust claimed that Ms. Lee "slammed" the drawers in her desk loudly and caused a "disruption in the office."  The suggestion that she caused any disruptive concern to Swarns is preposterous.  Ms. Lee, who barely weighs 100 pounds, could not possibly physically intimidate Swarns.

order to make other employees "feel comfortable" at work and accept unfair criticism without speaking up for yourself or standing up for your protected rights.

102.    Not surprisingly, when you are the only Asian female employee in the New York office, the last thing you are allowed to do is exhibit male-associated traits of anger by physically opening and closing desk drawers in a forceful way.

103.    While such conduct may not be considered acceptable behavior by female employees in SunTrust's Atlanta, Georgia offices, Ms. Lee's anger and frustration does not come close to the ball-busting behavior that men at SunTrust exhibited during her employment.

104.    Weiss' hothead reputation appears to have had nothing but a positive impact on his career at SunTrust, where he is touted as "leading the Northeast expansion of SunTrust's Private Wealth Management."[5]

105.    Similarly, Swarns' behavior has been rewarded by SunTrust by promoting him to lead the new Private Wealth Management office in Boston.

106.    Defendants' treatment of Ms. Lee has caused her immense damage.  In addition to the financial impact that her unlawful termination caused, the emotional impact has been, and continues to be, significant.

107.    In the months after she was fired, Ms. Lee learned that SunTrust employees have described her as "not liking men."  Despite relentless efforts to obtain new employment, Ms. Lee has not received one job offer.

---

[5]      https://www.bloomberg.com/press-releases/2019-05-06/suntrust-opens-private-wealth-management-office-in-boston (last visited on February 27, 2020)

## FIRST CAUSE OF ACTION
### (Discrimination in Violation of Title VII)
### *Against Truist, SunTrust and GFO*

108.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

109.    By the actions described above, among others, Defendants discriminated against Plaintiff based on her race, national origin, color and gender in violation of Title VII, including, but not limited to, by terminating Plaintiff's employment.

110.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

111.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

112.    Plaintiff is further entitled to an award of punitive damages as Defendants' unlawful conduct was and remains reckless, wanton and/or malicious.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of Title VII)
### *Against Truist, SunTrust and GFO*

113.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

114.    By the actions described above, Defendants retaliated against Plaintiff based on her protected activities in violation of Title VII, including but not limited to, by terminating Plaintiff's employment.

115.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

116.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

117.    Plaintiff is further entitled to an award of punitive damages as Defendants' unlawful conduct was and remains reckless, wanton and/or malicious.

**THIRD CAUSE OF ACTION**
**(Discrimination in Violation of Section 1981)**
***Against All Defendants***

118.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

119.    By the actions described above, Defendants have discriminated against Plaintiff on the basis of her race and/or color in violation of Section 1981, including, but not limited to, by terminating Plaintiff's employment.

120.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

121.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

122.    Plaintiff is further entitled to an award of punitive damages as Defendants' unlawful conduct was and remains reckless, wanton and/or malicious.

## FOURTH CAUSE OF ACTION
### (Retaliation in Violation of Section 1981)
### *Against All Defendants*

123.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

124.    By the actions described above, Defendants retaliated against Plaintiff based on her protected activities in violation of Section 1981, including but not limited to, by terminating Plaintiff's employment.

125.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

126.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

127.    Plaintiff is further entitled to an award of punitive damages as Defendants' unlawful conduct was and remains reckless, wanton and/or malicious.

## FIFTH CAUSE OF ACTION
### (Discrimination in Violation of the ADEA)
### *Against Truist, SunTrust and GFO*

128.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

129.    By the actions described above, Defendants have discriminated against Plaintiff on the basis of her age in violation of the ADEA, including, but not limited to, by terminating Plaintiff's employment.

130.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the ADEA, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

131.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

132.    Plaintiff is further entitled to an award of liquidated damages as Defendants' unlawful conduct was and remains willful.

### SIXTH CAUSE OF ACTION
**(Retaliation in Violation of the ADEA)**
***Against Truist, SunTrust and GFO***

133.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

134.    By the actions described above, Defendants retaliated against Plaintiff based on her protected activities in violation of the ADEA, including but not limited to, by terminating Plaintiff's employment.

135.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the ADEA, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

136.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

137.    Plaintiff is further entitled to an award of liquidated damages as Defendants' unlawful conduct was and remains willful.

**SEVENTH CAUSE OF ACTION**
**(Discrimination Under the NYSHRL)**
*Against All Defendants*

138.   Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

139.   By the actions described above, among others, Defendants discriminated against Plaintiff based on her race, color, national origin, age and gender in violation of the NYSHRL, including, but not limited to, by terminating Plaintiff's employment.

140.   As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

141.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

142.   Plaintiff is further entitled to an award of punitive damages as Defendants' unlawful conduct was and remains reckless, wanton and/or malicious.

**EIGHTH CAUSE OF ACTION**
**(Retaliation Under the NYSHRL)**
*Against All Defendants*

143.   Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

144.   By the actions described above, Defendants retaliated against Plaintiff based on her protected activities in violation of the NYSHRL, including but not limited to, by terminating Plaintiff's employment.

145.   As a direct and proximate result of Defendants' unlawful discriminatory conduct

in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages.

146.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

147.    Plaintiff is further entitled to an award of punitive damages as Defendants' unlawful conduct was and remains reckless, wanton and/or malicious.

### NINTH CAUSE OF ACTION
### (Discrimination Under the NYCHRL)
### *Against All Defendants*

148.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs as if fully set forth herein.

149.    By the actions described above, among others, Defendants discriminated against Plaintiff based on her gender, race, color, national origin and age in violation of the NYCHRL, including, but not limited to, by terminating Plaintiff's employment.

150.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

151.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

152.    The unlawful actions of Defendants were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to

amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## TENTH CAUSE OF ACTION
### (Retaliation Under the NYCHRL)
***Against All Defendants***

153.    Plaintiff repeats and re-alleges each and every allegation in all of the preceding paragraphs as if fully set forth herein.

154.    By the actions described above, Defendants retaliated against Plaintiff based on her protected activities in violation of the NYCHRL, including, but not limited to, by terminating Plaintiff's employment.

155.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

156.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and other relief.

157.    The unlawful actions of Defendants were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

B.      An injunction and order permanently restraining Defendants from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.      An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

D.      An award of damages against Defendants, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her emotional distress;

E.      An award of punitive damages, in an amount to be determined at trial;

F.      An award of liquidated damages, in an amount to be determined at trial;

G.      Prejudgment interest on all amounts due;

H.      An award of Plaintiff's reasonable attorneys' fees and costs to the fullest extent permitted by law; and

I.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: March 2, 2020
New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
Jeanne M. Christensen
Tanvir H. Rahman

85 Fifth Avenue
New York, New York 10003
Telephone: (212) 257-6800
Facsimile: (212) 257-6845
jchristensen@wigdorlaw.com
trahman@wigdorlaw.com